# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HIGHMARK BLUE CROSS BLUE )
SHIELD WEST VIRGINIA, )
                                                )   2:17-cv-00786
                Plaintiff, )
                                                )
                v. )
                                                )
DANIEL JOHNSON, et al., )
                                                )
              Defendants. )

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiffs Highmark Blue Cross Blue Shield West Virginia ("Highmark") and, by later addition,[1] the Joint Board of Trustees of the Carpenters Health Fund of West Virginia ("Trustees") bring this case against Defendant Daniel Johnson and Mr. Johnson's attorney, Defendant Dwayne Ross ("Attorney Ross"), pursuant to § 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3). Attorney Ross filed the pending Motion for Summary Judgment, ECF No. 25, seeking dismissal of the Complaint as to him, arguing Plaintiffs cannot establish a claim for equitable relief against him under § 502(a)(3) of ERISA. For the reasons that follow, the Motion for Summary Judgment is denied without prejudice.

Defendant Johnson sustained injuries in an automobile accident for which Carpenters Health Fund of West Virginia (the "Plan") provided benefits, as Johnson was a participant and covered person under the terms of the Plan. (Attorney Ross's Concise Statement of Uncontested Material Facts ("Attorney Ross's CSUMF"), ECF No. 27, ¶¶ 2, 3.) Following the accident,

---

[1] Defendant Dwayne Ross's argument on Highmark's lack of standing is rendered moot by the Court's granting of Plaintiff's Motion to Amend/Correct Complaint, ECF No. 37. *See* Order of Febr. 27, 2018, ECF No. 42.

Defendant Johnson retained counsel, Attorney Ross, to file a claim for Underinsured Motorist ("UIM") benefits against Johnson's auto insurer, Liberty Mutual Insurance. (*Id.* ¶ 6.) That claim resulted in a settlement[2] (the "UIM Settlement"). Plaintiffs assert that the Plan had a right of first priority to the entire UIM Settlement (Compl., ECF No. 1, ¶ 19), but Attorney Ross divided the proceeds as follows: he placed $10,000 in an escrow account for further costs associated with pursuing a civil action against the person or entities legally responsible for Johnson's injuries (e.g., the other driver in the automobile accident);[3] he dispersed proceeds to Defendant Johnson; and he placed his contingency fee in his law firm's "general account."[4] (*Id.* ¶¶ 8, 9; Attorney Ross Am. Aff., ECF No. 32-1, ¶ 7.) Plaintiffs seek individual equitable relief against Defendant Johnson and Attorney Ross for whatever UIM Settlement proceeds are in each's possession. The pending Motion for Summary Judgment only addresses the latter: Plaintiffs' claim for equitable relief against the funds held by Attorney Ross.

The record before the Court consists of the pleadings,[5] papers in support and opposition to the pending Motion for Summary Judgment,[6] Attorney Ross's Amended Affidavit, the Agreement and Declaration of Trust (ECF No. 25-3 ("Trust Agreement")), the Summary Plan Description dated August 2011 (ECF No. 25-4 ("2011 SPD")), and the Third Amendment to the 2012 SPD (ECF No. 25-5 ("2012 Amendment")).[7] With this information, the Court must

---

[2] The record is silent on the actual amount of the settlement.

[3] "The Plan is not interested in pursuing the $10,000 in Attorney Ross's escrow account . . . ." (Attorney Ross's CSUMF, ECF No. 27, ¶ 11.)

[4] The record is silent on the actual amount of attorney's fees placed in the general account.

[5] Compl., ECF No. 1; Answers, ECF Nos. 12, 14.

[6] Def.'s Br. in Supp., ECF No. 26; Def.'s Concise Statement of Uncontested Material Facts, ECF No. 27; Pl.'s Br. in Opp'n, ECF No. 29; Pl.'s Resp. to Def.'s Concise Statement of Uncontested Material Facts, ECF No. 30; Def.'s Reply to Pl.'s Br. in Opp'n, ECF No. 32.

[7] The actual 2012 SPD is not in the record.

decide whether, as a matter of law,[8] Plaintiffs can assert a claim for equitable relief under § 502(a)(3) against Attorney Ross, who is not a party to the Plan, on the basis that Attorney Ross took a contingency fee from the UIM Settlement and placed it in his law firm's general account. Plaintiffs argue that because the terms of the Plan require first-priority reimbursement of its paid expenses should the participant (Defendant Johnson) later recover money from third parties for his injuries, Attorney Ross's contingency fee, a component of Johnson's UIM Settlement, is a portion of that UIM Settlement that is subject to an equitable lien.

The Court begins its analysis by addressing Attorney Ross's arguments that, as a matter of law, no claim in equity is available under these circumstances. The Court concludes that such a claim is available as a matter of law, because the designated portion of the UIM settlement proceeds, if sitting in the identified general account, remains a traceable asset subject to an equitable lien, and a plan participant's attorney, who is not a signatory of the plan, may be the subject of a §502(a)(3) claim. However, the factual issue of whether the UIM Settlement funds are still in the general account still looms. Next, the Court turns to Attorney Ross's arguments that the specific language of the Trust Agreement, the 2011 SPD, and the 2012 Amendment do not entitle the Plan to subrogation from settlement funds paid by the UIM carrier.

---

[8] While Plaintiff Highmark objected to the procedural posture of the case, arguing the Motion should be for one to dismiss rather than one for summary judgment, it did not file a Rule 56(d) affidavit or declaration. Given that the record goes beyond the pleadings, including exhibits attached to the Motion for Summary Judgment, the Court will treat the pending Motion as one for summary judgment. Therefore, the appropriate standard of review is that a party is entitled to summary judgment if it can show that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'affects the outcome of the suit under the governing law' and could lead a reasonable jury to return a verdict in favor of the nonmoving party." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party bears the burden of demonstrating that the evidentiary record presents no genuine issue of material fact. *Willis*, 808 F.3d at 643. If it does so, the burden shifts to the nonmoving party to "identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden . . . the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643. Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court concludes that genuine issues of material fact preclude the Court from resolving that issue on the current record before it.

## I. Traceability

Attorney Ross initially argues that he is not in possession of any settlement funds, so an equitable lien cannot attach to any monies in the law firm's general account. "[A] plaintiff could ordinarily enforce an equitable lien only against specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds (*e.g.*, identifiable property like a car)." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 655 (2016). *Montanile* addressed the narrow issue of whether a plan may seek equitable relief from general assets when the settlement funds have been dissipated. *Id.* at 658. Attorney Ross's Amended Affidavit, establishes that the funds in controversy, the contingency-based attorney's fee from the UIM Settlement, were placed in Defendant Ross's law firm's general account. (ECF No. 32-1, ¶ 7.) Thus, the question is whether funds from the UIM Settlement are still traceable once they become a contingency fee and are placed in a law firm's general account. The Court concludes that the funds, if sitting in the general account,[9] remain traceable assets that could be subject to an equitable lien. *U.S. Renal Care Inc. v. WellSpan Health*, 709 F. App'x 160, 161 (3d Cir. 2018).

In *U.S. Renal Care*, the plaintiff argued that *Montanile* defeats a claim for an equitable lien once funds (in that case erroneous overpayments) were deposited into a general account, but the district court concluded that the funds were still identifiable and traceable. No. 14-cv-2257, 2017 WL 1062374, at *8 (M.D. Pa. Mar. 21, 2017). Our Court of Appeals affirmed, stating that "Wellspan identified a specific fund in Renal Care's possession (its operating account) and the

---

[9] Attorney Ross's Amended Affidavit asserts that "[f]unds located in my law firm's general account are then dispersed in the normal course of business." (Attorney Ross Am. Aff., ECF No. 32-1, ¶ 8.) It is entirely unclear from the record whether those funds have been dispersed *in toto*.

4

particular share of that fund to which it is entitled (the amount of the overpayments)." 709 F. App'x 160, 161 (3d Cir. 2018) ("Renal Care's commingling of WellSpan's overpayments with other moneys in its operating account does not make the overpayments untraceable."). Thus, the fact that the portion of the UIM Settlement at issue, the contingency fee, is sitting in the law firm's operating account does not destroy traceability, and an equitable lien could attach.

But there is a problem. Attorney Ross's Amended Affidavit also states that "[f]unds located in my law firm's general account are then dispersed in the normal course of business. I did not purchase any traceable items with the funds." (ECF No. 32-1, ¶¶ 8, 9.) What is missing from this affidavit is whether any of the *UIM Settlement funds* placed in the general account are or are not still there. The Amended Affidavit simply said "funds" are "dispersed in the normal course of business." (*Id.*). Thus, there is a genuine issue of material fact: are any of the identified UIM Settlement funds still there?

Here is why the answer to that question is critical. The Supreme Court clarified in *Montanile* that "a plaintiff could ordinarily enforce an equitable lien only against specifically identified funds *that remain in the defendant's possession* or against traceable items that the defendant purchased with the funds." 136 S. Ct. at 568. The Amended Affidavit makes clear this is not a case (on this record) addressing traceable items. (ECF No. 32-1, ¶¶ 8, 9.) With respect to identifiable funds, on the other hand, if the UIM proceeds are no longer in the general account, then there are no longer specifically identifiable funds to which an equitable lien could attach.

This issue (whether settlement funds remain identifiable after dispersal) divided the panel in *Airtran Airways, Inc. v. Elem*, 767 F.3d 1192, 1198 (11th Cir. 2014), *vacated*, 136 S. Ct. 979 (2016). The *AirTran* majority's holding was vacated and remanded in light of *Montanile*, 136 S. Ct. 979. The *AirTran* dissenting opinion, on the other hand, lines up almost seamlessly with the

holding and rational in *Montanile*. In *Airtran*, settlement proceeds were distributed to a plan participant with a fee going to her settlement attorney, and the plan brought suit against the participant, the attorney, and the attorney's law firm. 767 F.3d at 1196. The majority concluded that "[o]nce [the defendant] possessed those funds, the equitable lien by agreement attached to them, making them 'specifically identifiable.'" *Id.* at 1198 (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 362–63 (2006)). Judge Martin, in her dissent, agreed that the plan "properly identified specific funds, but failed to establish that the identifiable funds are 'in the possession and control' of the defendants." 767 F.3d at 1203. Without a showing that "those funds are presently in the defendant's possession," the dissents stated, the relief sought is not equitable. *Id.* at 1204. The problem (overlooked by the majority) in *AirTran* was that the plan could not point to the money's current location, and it only pled that settlement funds were "in the possession of" the attorney and the law firm. *Id.* at 1205–06. The dissent correctly summed up the problem: "The record before us simply tells us nothing about where the money is." *Id.* at 1208.

While the record in this case is clear that the UIM Settlement proceeds were placed in Ross's firm's general account, it is unclear if any of the proceeds are still there.[10] In order words, if it turns out the UIM Settlement funds are no longer sitting in the general account, then there is no equitable relief available to Plaintiffs. But this is an unresolved factual dispute. Attorney Ross, as the moving party, has the burden of demonstrating that the record presents no genuine issue of material fact and any inferences drawn from the underlying facts must be viewed in the

---

[10] The dissent in *AirTran* recognized the difficulty that ERISA plans face in their efforts to determine the exact location of distributed settlement money, and it suggested that restraining orders or preliminary injunctions can provide assistance. Plaintiff Highmark did seek a Temporary Restraining Order and Preliminary Injunction (ECF No. 20) but the Court denied it without prejudice to its being refiled on the basis that the moving papers were fatally vague and inconsistent. (Order, ECF No. 22.) The Court even provided specific guidance for a renewed motion. (*Id.*) Neither Plaintiff reasserted a motion for a temporary restraining order or preliminary injunction.

light most favorable to Plaintiffs. Therefore, the Court cannot grant the Motion for Summary Judgment in favor of Attorney Ross on this basis.

## II. Party to the Plan

Attorney Ross next argues that he is not a party to the Plan, so, regardless of where the UIM Settlement funds are, the Plan cannot enforce the terms of the Plan against him. Attorney Ross cites two cases in support, but neither resolve this issue. The first, *UFCW Local 1776 & Participating Employers Health & Welfare Fund v. DeBoer*, summarily concluded that any claims against the defendant attorneys do not arise under the ERISA statute because the attorneys did not hold any of the plan's assets, even though the attorneys collected attorney's fees from third-party settlements. No. 07-cv-738, 2008 WL 4367485, at *1 (E.D. Pa. Sept. 25, 2008).[11] The *DeBoer* Court offered no legal support for this conclusion, but it went on to address claims against the defendant attorneys under state law theories of interference with contractual obligations. *Id.* at 2. There are no state law claims at issue in this case, so the Court here is left with the *DeBoer* language, which has not been cited by any other federal court with respect to a claim for equitable relief against a defendant attorney.[12] The second case, *Treasurer v. Goding*, 692 F.3d 888 (8th Cir. 2012), confirms that actions under ERISA must be brought in equity. It does not assert that a non-signatory of the plan can never be the subject of an ERISA claim.

---

[11] The *DeBoer* Court stated:

> I have no difficulty in concluding that plaintiff's claims against [the plan participant] are the only ones which arise under the ERISA statute itself. Plaintiff is alleging that the terms of the plan have been violated, but the defendant attorneys are not signatories to the plan and are not directly bound by its terms. Neither are they ERISA fiduciaries, since they do not hold, and have never held, any of the plan's assets, and are not involved in its management.

2008 WL 4367485, at *1.

[12] *But see Chem. Containers, Inc. v. May*, No. 10-cv-774, 2010 WL 11509250, at *2 (M.D. Fla. July 12, 2010) (citing *DeBoer* in a footnote for the premise that attorneys of plan participants owe no fiduciary duty to the plan but noting that in the case before it the Plan was seeking a money judgment and not a transfer of title to an existing fund, which is not an eligible form of relief under § 502(a)(3)).

7

In *Goding*, a plan beneficiary, through attorneys at a law firm, received a third-party settlement. The law firm divided the settlement into three components: its attorney's fees, a portion equivalent to the reimbursement of the plan's contributions, and the remaining balance. The law firm distributed the balance to the beneficiary, placed the reimbursement amount in a trust, and deposited the attorney's fees in the firm's general account. *Id.* at 892. However, the law firm quickly dispersed the trust account to the beneficiary, who then declared bankruptcy. The plan sued the law firm, seeking to enforce the terms of the ERISA plan against the law firm as to the funds held in trust, but it did not seek to enforce as to the funds that were characterized as attorney's fees. *Id.* at 897 ("[The law firm] initially held in trust the $11,423.79 *to which [the plan] claims an interest*, but he eventually disbursed the entirety of that sum to [the participant]. [The law firm] thus no longer has any money *to which [the plan] claims an interest*." (emphasis added)). Because the plan was only going after the monies that were once held in trust but then dispersed elsewhere, as opposed to the deposited attorney's fees, the plan was unable to enforce an equitable lien as soon as the fund dissipated. The plan was "essentially attempting to impose personal, or legal, liability" on the law firm for conferring a benefit on the participant. *Id.* Interestingly, the *Goding* Court noted that recovery in equity against an attorney "is generally possible," *id.* at 894, and a party "still holds the property or properties which is in whole or part of its product." *Id.* at 896. The money to which Plaintiffs in this case claim an interest, the attorney's fees, may still be in the possession of Attorney Ross. They may not been dissipated and, as explained above, may remain identifiable and traceable.

Attorney Ross's cited authority, therefore, does not answer the question of whether a plan participant's attorney, who is not a signatory of the plan, can be the subject of a §502(a)(3) claim. Upon review of the case law, the Court cannot conclude as a matter of law that a plan

participant's attorney, who is not a signatory of the plan, cannot be the subject of a §502(a)(3) claim if he or she has possession of traceable settlement funds. The Supreme Court has acknowledged that the ERISA statute does not limit the universe of defendants in § 502(a)(3) claims. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The Court of Appeals for the Sixth Circuit relied on *Harris Trust* when it affirmed a district court's denial of a defendant attorney's motion for summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 462 (6th Cir. 2009) ("[T]here is no statutory barrier that prevents [the defendant attorney] from being a defendant in a suit brought pursuant to § 502(a)(3) of ERISA, provided that the relief sought lies in equity.").

In *Longaberger*, the defendant attorney represented a plan participant in a civil tort action against negligent drivers who caused an automobile accident that injured the plan participant. *Id.* The plan sought reimbursement of the covered participant's medical bills by claiming an equitable lien. The defendant attorney argued that any funds he may possess (including his attorney's fees from the settlement) could not be subject to a claim under ERISA because he was neither a plan fiduciary nor a beneficiary of the plan. *Id.* at 467–68. Although, the *Longaberger* decision has been overruled in part by *Montanile*, its holding that "there is no barrier that prevents [a plan participant's] attorney from being a defendant in a suit brought pursuant to § 502(a)(3) of ERISA, provided that the relief sought lies in equity" still holds water. 586 F.3d at 468.

Therefore, Attorney Ross's broader statutory arguments fail, and the Court cannot conclude as a matter of law that § 502(a)(3) prohibits relief through an equitable lien on the settlement funds if they are sitting in the law firm's account. The Court now turns to whether

Plaintiffs are entitled to such relief under the specific terms of the Trust Agreement, the 2011 SPD, and the 2012 Amendment.

### III. Terms of the Plan under the Trust Agreement and SPD

Attorney Ross argues that the governing document of the Plan, the Trust Agreement, does not have a subrogation and reimbursement provision, and statements in the 2011 SPD or 2012 Amendment do not constitute binding terms of the Plan. Without such a provision in the Trust Agreement itself, Attorney Ross contends, the Plan is not entitled to any subrogation whatsoever. Plaintiffs, on the other hand, argue that a written summary plan description can be an enforceable plan document when (as here) a trust agreement, which does not specify under what conditions benefits would be paid but authorizes its board to create a written plan of benefits, authorizes such a summary plan description. Plaintiffs argue that the Trust Agreement in this case clearly contemplated and authorized the creation of the SPD to be an enforceable written plan of benefits, so the SPD's subrogation clause is valid and enforceable.

Other courts have addressed the interplay between a trust agreement and summary plan descriptions. In *Board of Trustees v. Moore*, the plan had paid medical expenses following its participant's injuries in an accident. 800 F.3d 214, 216 (6th Cir. 2015). The participant received a settlement from the entities responsible for his injuries, and the plan brought suit against the participant and the participant's settlement attorney, seeking reimbursement for those paid medical expenses pursuant to the subrogation clause in the plan's summary plan description. *Id.* The district court "concluded that the summary plan description containing the subrogation provision set out the binding terms of the Plan," and the Court of Appeals for the Sixth Circuit affirmed. *Id.* While the trust agreement in *Moore* established and funded the plan and set out methods of election, powers, and obligations of the board, the trust agreement did not contain the

"nuts and bolts" of a health plan such as the services that are covered, how to file a claim, eligibility information, and more. *Id.* The trust agreement, instead, included a paragraph that stated, "the detailed basis on which payment of benefits is to be made pursuant to this Trust Agreement shall be set forth in the Plan of Welfare Benefits . . . ." *Id.* Instead of drafting a welfare benefits plan, the board simply created a summary plan description. *Id.* at 219. The board then approved the summary plan description, which was the only other document drawn up, and the board's corporate representative explained in his deposition that the summary plan description constituted the welfare benefits plan provided for in the trust agreement. *Id.*

Finding support in cases from other Circuits, the Court of Appeals for the Sixth Circuit held that the summary plan description may function as the controlling terms of an ERISA plan in the absence of a separate plan document, and it affirmed the district court's ruling that the subrogation provision in the summary plan description was enforceable against the proceeds of the participant's third-party settlement. *Id.* at 219–20.

The *Moore* Court also addressed, and rejected, the same argument that Attorney Ross makes in this case: that *CIGNA Corp. v. Amara* forecloses summary description plans providing actual plan terms. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) ("[W]e conclude that the summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)."). As the *Moore* Court explained, "In *Amara*, however, it was clear that one document functioned as the plan itself, that a different document functioned as the summary plan description, and that the two documents contained conflicting terms." *Moore*, 800 F.3d at 220. *Amara* did not foreclose the situation where a document functions as both the ERISA plan and the summary description plan, "if the terms of the plan so provide." *Id.*; *see also Bd. of Trs. of*

*the Nat'l Elevator Indus. Health Benefit Plan v. Montanile*, 593 F. App'x 903, 910 (11th Cir. 2014), *vacated on other grounds*, 136 S. Ct. 651 (2016) ("[T]he *Amara* Court's rejection of the proposition that summary plan descriptions 'necessarily may be enforced . . . as the terms of the plan itself' leaves open the possibility that terms in those summaries may, at times, be enforced, even though they are not always enforceable. *See Amara*, 131 S. Ct. at 1877."); *Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017) ("But by clear design reflected in provisions of both documents, the two documents together constitute a plan. Accordingly, we conclude that the ERISA plan is the Trust Agreement plus the SPD.")

The Court now turns to the Trust Agreement and SPD in this case. First, the Trust Agreement authorizes the Trustees such powers and duties:

> i. To adopt and prescribe rules and procedures . . . to be followed in determining entitlement of participants and beneficiaries for health and welfare benefits, the entitlement to rights therein and thereto, and the method of applying for health and welfare benefits. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust Fund shall be binding upon all parties hereto, all parties dealing with the Trust, and all persons claiming any benefits hereunder.

(Trust Agreement, ECF No. 25-3, at 15.) Unlike the trust agreement in *Moore*, this Trust Agreement does not specifically designate a particular document to lay out the "nuts and bolts" of the Plan. More importantly, the record before the Court here and now does not indicate whether the SPD, presumably amended each year, was the only document drawn up from the Trust Agreement. It is possible that there is a separate welfare benefits plan, or it is possible there is not. However, this is a factual issue that remains outstanding. The absence of other existing documents stemming from the trust agreement was crucial in the *Moore* Court's conclusion that the summary plan description functions as a plan document. In addition, the record contains no evidence of the Trustee's intentions with the 2011 SPD (or any other year) or with respect to quoted Paragraph (i) of the Trust Agreement. Unlike *Moore*, there is no deposition testimony or

affidavit from Plaintiffs' representatives to the effect that the 2011 SPD in the record constituted the welfare benefits plan provided for by the Trust Agreement and that no other adopted or prescribed rules and procedures exist.

Therefore, although the Court rejects Attorney Ross's argument that statements in a summary plan description can never constitute the terms of the Plan, it also cannot conclude as a matter of law that the 2011 SPD's subrogation clause and the 2012 Amendment by extension are not binding in this case. There is no evidence in the record as to how rules and procedures contemplated by the Trust Agreement were actually adopted and prescribed, and there is no evidence in the record as to how the Trustees intended the provisions of the SPD and Trust Agreement to operate.

### IV. Terms of the Plan under the Trust Agreement and SPD

Even if this Court were able to conclude that the terms of the SPD constitute binding terms of the Plan, thus rendering the SPD's subrogation clause, as amended by the 2012 Amendment, generally enforceable, there is also an issue of material fact with respect to the specific settlement proceeds at issue here. The contradictory language within the 2011 SPD and the 2012 Amendment creates an issue of material fact as to whether the subrogation clause in the relevant SPD, if enforceable, captures the proceeds of the UIM Settlement.

The Subrogation Clause in the 2011 SPD states, in part as relevant to this case:

9.02- SUBROGATION

> The right is hereby given to the Plan to receive from any third party(ies), attorney(s) or insurance company(ies) an amount equal to all (100%) of benefits paid (past, present or future) on behalf of the Participant, Dependent or Beneficiary.
> . . . .
>
> The Plan will have first priority to recover any payments made or anticipated to be made if the Participant, Dependent or Beneficiary has been **compensated by**

13

**a third party for an injury or illness for which a settlement, judgment, or any payment is received.**

(2011 SPB, ECF No. 25-4, at 38–39 (emphasis added).) Attorney Ross points to the 2012 Amendment, arguing that the 2011 SPD language was replaced with the language from the 2012 Amendment, which states, in relevant part:

> The Plan shall be entitled, to the extent of any payment made to a Participant or Dependent to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of a Participant or Dependent **against any person or entity legally responsible for the injury, sickness or condition for which such payment is made.** The Plan's right of first recovery shall apply regardless of whether the award is designated for medical benefits, damages, pain and suffering or any other designation related to the injuries or attorneys' fees. The common fund and make whole doctrines are specifically rejected for the purposes of this Section.

(2012 Amendment, ECF No. 25-5, at 6.)

As a preliminary matter, the Amendment states that it acts as an amendment to the "Summary Plan Description (Plan) dated January 1, 2012." (ECF No. 25-5, at 1.) The 2012 Summary Plan Description is not in the record, so the Court can only compare what was in the 2011 SPD to the 2012 Amendment. Regardless, Attorney Ross argues that the 2011 Amendment makes clear that the subrogation right applies "against any person or entity *legally responsible* for the injury, sickness, or condition for which such payment is made," and a UIM carrier is not such "person or entity legally responsible for injury." (Def.'s Br. in Supp., ECF No. 26, at 8.) Attorney Ross argues that a UIM carrier does not meet that description but instead acts as a safeguard when the entity that is legally responsible cannot pay the participant on account of a lack of insurance. (*Id.*)

Plaintiffs counter that (1) the scope of the 2012 amendment to the SPD was only to provide a minimum contribution rate for coverage in order to comply with the Affordable Care

14

Act ("ACA"); (2) the ACA had no impact on subrogation rights, so any change in language should not be interpreted to mean the reach of the SPD is somehow altered as a result of the 2012 amendment; (3) even so, the language as it stands when read in the context of the entire provision makes it clear that settlement money from a UIM insurance carrier is within the purview of the subrogation clause because the first sentence articulates that the subrogation applies against "any person or entity responsible"; and (4) "legally responsible" captures UIM carriers because a UIM contract creates a legal responsibility to an injured party.

The respective arguments from the parties demonstrates that there is a genuine issue of material fact with respect to this Subrogation Clause, specifically as to whether it is indeed enforceable here as to Attorney Ross (and also Mr. Johnson). The Court concludes that there is tension in the changing SPD language between the 2011 SPD and the 2012 Amendment creating ambiguity in meaning.[13] There is also the issue of how Pennsylvania's UIM coverage functions and whether a UIM carrier meets the definition of "legally responsible" as that term was

---

[13] Our Court of Appeals summarized the standard for evaluating ambiguities in ERISA plan documents as follows:

> Whether terms in an ERISA Plan document are ambiguous is a question of law. A term is "ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991); *Mellon Bank, N.A. v. Aetna Bus. Credit Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980). In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of document. *In Re UNISYS Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 902 (3d Cir. 1995) ("The written terms of the plan documents control . . . ."). If the plain language of the document is clear, courts must not look to other evidence. *In re Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir. 1996) (quoting *Mellon Bank*, 619 F.2d at 1013) ("Our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation. Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent . . . .")). But if the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document. However, "it is inappropriate to consider such [extrinsic] evidence when no ambiguity exists." *Epright v. Envtl. Res. Mgmt, Inc. Health & Welfare Plan; ERM*, 81 F.3d 335, 339 (3d Cir. 1996).

*Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001).

intended by the Trustees.[14] There is no evidence in the record showing the Trustee's intentions with respect to the changed and ambiguous language or with respect to how that language has been otherwise applied or construed. The Court cannot discern the meaning of the subrogation clause as a matter of law on the record before it. This, too, precludes granting Attorney Ross's Motion for Summary Judgment.

V. **Conclusion**

The Motion for Summary Judgment, ECF No. 25, is denied without prejudice. An appropriate Order will follow.

Mark R. Hornak
United States District Judge

cc: All counsel of record

Dated: July 17, 2018

---

[14] *See Johnson v. Concord Mut. Ins. Co.*, 300 A.2d 61, 64 (Pa. 1973) ("The purpose of [uninsured motorist] coverage is to 'afford financial recompense to persons who receive injuries or the dependents of those who are killed, solely through the negligence of motorists, who, because they are uninsured and not financially responsible, cannot be made to satisfy a judgment.'" (quoting 2 John E. Long, *The Law of Liability Insurance* § 24.03 (1972)); *Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1235–36 (Pa. 1994) ("The purpose of underinsured motorist coverage is to protect the insured (and his additional insureds) from the risk that a negligent driver of another vehicle will cause injury to the insured (or his additional insureds) and will have inadequate coverage to compensate for the injuries caused by his negligence.") (quoting *Wolgemuth v. Harleysville Mut. Ins. Co.*, 535 A.2d 1145 (Pa. Super. 1988)).

16